IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


CUSTOM RUBBER CORPORATION )

)

Plaintiff, )

)

v. )

)

ATS SPECIALIZED, INC. )

)

Defendant. )

CASE NO. 1:07 CV 2593

MAGISTRATE JUDGE McHARGH

**MEMORANDUM AND ORDER**


On August 6, 2008 Defendant ATS Specialized, Inc. ("ATS") filed a *Motion for Judgment on the Pleadings* on Plaintiff's Claim for Attorney Fees Under the Carmack Amendment against Plaintiff Custom Rubber Corporation ("Custom Rubber").  (Doc. 34).  Custom Rubber filed an opposition on August 14, 2008, and ATS filed a reply on August 29, 2008.  (Doc. 37, 40).  On August 28, 2008, Custom Rubber  filed a *Motion for Summary Judgment* against ATS.  (Doc. 39).  ATS filed its own *Motion for Summary Judgment* against Custom Rubber on September 2, 2008.  (Doc. 44).  Both parties filed oppositions and replies.  (Doc. 50, 52, 55, 59).  For the reasons stated below, Custom Rubber's *Motion for Summary Judgment* (doc. 39) is GRANTED in part and DENIED in part; ATS' *Motion for Summary Judgment* (doc. 44) is GRANTED in part and DENIED in part; and ATS' *Motion for Judgment on the Pleadings* (doc. 34) is DENIED as moot.  Specifically, the Court holds that: (1) ATS is liable to Custom Rubber for $137,785.00 under the Carmack

1

Amendment and the ATS bill of lading; (2) ATS is not entitled to set off from Custom Rubber's recovery the insurance proceeds Custom Rubber received from its insurer; and (3) Custom Rubber may not recover either special or consequential damages or attorney's fees.

## I. FACTS

This case arises out of shipping accident.  Custom Rubber manufactures and sells rubber moldings for use in a variety of end products.  (Doc. 46, at ¶ 2).  ATS is a trucking company that transports goods throughout the United States.  (*See* doc. 35 ["Loghry Deposition"] [on file with Court], at 11).

On December 2, 2005, Custom Rubber placed an order with Rutil Sr. 1 ("Rutil"), an Italian manufacturer, for the purchase of an injection press to use in its business.  The cost of the press was $314,200.  (Doc. 46, at ¶ 3).  An Italian company, Casasco & Nardi, Inc. ("Nardi") brokered the international shipment and acted as freight forwarder for the shipment and delivery of the press into the United States.  (*Id.*, at ¶ 4).  Nardi hired Hapag-Lloyd to ship the press overseas from Italy to New Jersey and Atlantic Logistic Services ("ALS") to orchestrate the domestic leg of the machine's journey.  (*Id.*, at ¶ 5, 8).  Nardi also hired Carmichael International Service ("Carmichael") to act as customs house broker and to serve as attorney-in-fact for Custom Rubber as the press went through United States Customs.  (Doc. 44, Defendant's Exhibit ["DX"] B, at ¶¶ 7, 12).  ALS hired Harbor Freight Transportation Company ("Harbor Freight") to unload the press from the ship and ATS to transport the press from Port Newark to Cleveland.  (*Id.*, DX C, at ¶ 13).  Hapag-Lloyd and ATS each issued its own bill of lading.  (*Id.*, DX D; doc. 39, PX A-6).  Neither Nardi, Carmichael nor ALS issued a bill of lading.

2

The Hapag-Lloyd bill of lading contains a liability limitation pursuant to the Carriage of Goods By Sea Act ("COGSA").  It states:

> (2) U.S. Carriage of Goods by Sea Act Limitation
>
> Notwithstanding any of the foregoing to the contrary, in the event that suit is brought in a court in the United States of America and such court, contrary to Clause 12, accepts jurisdiction, then the Carriage of Goods by Sea Act (COGSA) shall be compulsorily applicable to this contract of carriage if this Sea Waybill covers a shipment to or from the United States.  The provisions set forth in COGSA shall also govern before the Goods are loaded on or after they are discharged from the vessel, provided, however, that the Goods at said time are in the actual custody of the Carrier or any Servant or Agent.  The Carrier's maximum liability in respect to the Goods shall not exceed USD $500.

(Doc. 44, DX D).

The ATS bill of lading also contains a liability limitation.  It states:

> NOTE: Carrier's liability for loss of damage to any article or package transported shall be limited to $1.00 per pound (used machinery) or $2.50 per pound (all other articles) of cargo weight as specified in Carrier's Governing Rules Tariff.  To declare a value greater than $1.00 or $2.50 per pound, contact carrier for written alternate rate quote, and return quote to ATS and also declare such valuation here_____By_____.  Failure to return signed written alternate rate quote to ATS and pay for greater value charges will revert Carrier's liability to $1.00 or $2.50 per pound.

(Doc. 39, Plaintiff's Exhibit ["PX"] A-6).  The ATS bill of lading at issue in this case does not contain a declaration of alternate shipment valuation.  (*Id.*).  According to the ATS bill of lading, the new Rutil press weighed 55,114 pounds when shipped.  (*Id.*).

Carmichael invoiced Custom Rubber $28,807.60 for the transportation of the press from Italy to the United States.  (Doc. 44, DX B, at ¶ 13).  The charges included ocean freight costs paid to Nardi in the amount of $16,850.00; $125.00 for the Carmichael customs fee; and $1246.27 in insurance premiums paid to Avalon Risk Management for a mandatory bond.  (*Id.*)

Nardi obtained an insurance policy from an Italian insurer, Aurora Assicurazioni ("Aurora"), on behalf of Custom Rubber to cover the machine during its shipment from Italy to the United States. (Doc. 46, at ¶ 15).  The approximate coverage of the insurance policy was $348,000.00.  (*Id.*).

On July 24, 2006 Rutil notified Custom Rubber that the Rutil press would ship on or about July 29, 2006 to the United States aboard the Hapag-Lloyd ocean vessel, the Maersk Madrid.  (Doc. 45 ["Braun Deposition"] [on file with Court], at 47); Braun Deposition Exhibit 2).  Apparently, the overseas portion of the press' journey was uneventful, and the press arrived at Port Newark, New Jersey on August 13, 2006 in good condition.  (Loghry Deposition, at 47-48).

ALS arranged with Harbor Freight to unload the press from the Maersk Madrid upon its arrival at Port Newark and to store the press in Harbor Freight's warehouse until ATS could pick up the press for transport to Cleveland.  (Doc. 44, DX C, at ¶ 13).  On or about August 22, 2006, ATS' driver, Michael Loghry, arrived at the Harbor Freight warehouse in Port Newark to pick up and transport the press.  (Loghry Deposition, at 7, 17-18).  A Harbor Freight crane operator loaded the press onto the ATS trailer at Mr. Loghry's direction.  (*Id.* at 28).  Mr. Loghry had the crane operator place the press between the two axles of the truck's trailer.  (*Id.* at 38).  Once the press was loaded, Mr. Loghry secured the press to the trailer using straps and chains.  (*Id.*).  Mr. Loghry then departed Port Newark with the press.  (*Id.* at 57).  He felt confident that the load was secure.  (*Id.* at 43).

Mr. Loghry stopped for a weigh-in at Travel Centers America in Columbia, New Jersey on the way from Port Newark to Cleveland.  (*Id.* at 58).  During the weigh-in, it was determined that the press was placing too much weight on the rear axle of the trailer.  (*Id.* at 60).  Mr. Loghry called a commercial wrecker to pull the press forward so that the weight distribution on the trailer would comply with the applicable legal requirements.  (*Id.*).  The press was repositioned at Mr. Loghry's

4

direction and re-weighed several times before Mr. Loghry was satisfied that the load was adequately centered and the weight properly distributed.  (*Id.* at 64).  Once the load was in place, Mr. Loghry again secured the load with straps and chains and set out for Cleveland.  (*Id.* at 62, 69-70).

Mr. Loghry later stopped at a Flying J in Brookfield, Pennsylvania.  (*Id.* at 71).  At the Flying J, Mr. Loghry made a U-turn to get into the parking spot he wanted, and the trailer he was hauling twisted and tipped over.  (*Id.* at 71-74).  Consequently the attached press fell over and hit the ground, sustaining damage.  (*Id.* at 73-74).

Mr. Loghry contacted ATS to send help after the accident, and the police department, fire department, and Hazardous Materials later arrived at the scene.  (*Id.* at 76-77).  ATS sent a new driver to Brookfield the following morning to continue transporting the damaged press to Cleveland.  (*Id.* at 78).  On or about August 25, 2006, the damaged press arrived at Norris Brothers, Co., Inc.  (Doc. 46, at ¶ 11).  Custom Rubber inspected the press at Norris Brothers and indicated on the ATS bill of lading that the press was received in heavily damaged condition.  (*Id.*, at ¶ 12; doc 39, PX A-6).  Custom Rubber subsequently shipped the press back to Rutil in Italy for repairs.  (Doc. 46, at ¶ 13).  The cost of the repairs totaled $180,412.21.  (*Id.*, at ¶ 14).  Custom Rubber also incurred expenses in the amount of $27,010.67 for shipping the machine back to Italy for repairs, rigging and storing the machine, and $12,820.66 for a duty deposit.  (*Id.*).  Custom Rubber later received a duty drawback in the amount of $9707.25.  (Doc. 53, at 1).

Custom Rubber filed a claim with Aurora for the damage to the press.  (Doc. 46, at ¶ 16). The claim settled, and Custom Rubber received approximately $95,000 in insurance proceeds.  (*Id.*). According to Custom Rubber, approximately $10,000 of the insurance proceeds went to Custom Rubber's previous attorney and the remaining $85,000 went to Rutil to help cover the cost of

5

repairing the machine.  (*Id.*).  Custom Rubber claims that it currently owes Rutil approximately $107,000.00 for the cost of repairs.  (*Id.*, at ¶ 17).  It claims a total of $210.536.29 in damages.  (Doc. 53, at 1).  This amount represents the cost of repairing the machine, the costs of rigging, storing, and shipping the machine back to Italy for the repairs, and the duty deposit less the duty drawback.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the entire record "shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of showing the absence of any such genuine issues of material facts:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" only if its resolution might affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Once the moving party has satisfied its burden of proof, the burden then shifts to the non-moving party pursuant to Federal Rule of Civil Procedure 56(e), which states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In ruling on a motion for summary judgment, the court must construe the evidence, as well as any inferences to be drawn from it, in the light most favorable to the party opposing the motion.

6

*See Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 229 (6th Cir. 1990).  The court must also determine "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must, as a matter of law, prevail over the other." *Anderson*, 447 U.S. at 249.  In reaching such a determination, however, the court is not to decide disputed questions of fact, but only to determine whether genuine issues of fact exist. *Id.* at 248-49. Moreover, the "trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Circuit 1988).

The Supreme Court has held "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322

### III. LAW AND ANALYSIS

#### A.  The Applicable Bill of Lading

Two bills of lading issued in this case: (1) the Hapag-Lloyd bill of lading and (2) ATS' separate, domestic bill of lading.  (Doc. 44, DX D; doc. 39, PX A-6).  As explained more fully below, the body of law that applies to this case depends upon which bill of lading  governs the shipment at issue.  If the Hapag-Lloyd bill of lading governs, then the Carriage of Goods by Sea Act ("COGSA") applies.  If, by contrast, ATS' own bill of lading governs, then the Carmack Amendment applies to this case.  Whether COGSA or the Carmack Amendment applies to this case is important because each of these bodies of law has a different liability scheme and allows carriers to limit their liability in different ways. Contrary to ATS' suggestion, COGSA and the Carmack Amendment

7

cannot apply in concert.  *See e.g.*, *American Road Serv. Co. v. Consolidated Rail Corp.*, 348 F.3d 565 (6th Cir. 2003); *Altadis USA, Inc. v. Sea Star Line, LLC*, 458 F.3d 1288 (11th Cir. 2006).

### 1.  The ATS bill of lading and the Carmack Amendment

The Carmack Amendment applies to "transportation by a motor carrier . . . between a place in a State and place in another State or. . . [a place in] the United States and a place in a foreign country to the extent the transportation is in the United States." 49 U.S.C.A. § 13501(E).  However, the Sixth Circuit has held that the Carmack Amendment does not apply to shipments from a foreign country unless a domestic portion of the shipment is covered by a separate domestic bill of lading. *American Road, 348 F.3d at 568*.

It is undisputed that this shipment originated in Italy and was destined for Cleveland, Ohio. (Doc. 39, at 2; doc. 44, at 2).  It also is undisputed that ATS transported the machine from New Jersey to Cleveland and issued its own separate, domestic bill of lading to cover that portion of the journey.  (Doc. 39, PX A-6).

Although the Sixth Circuit has held that the Carmack Amendment does not apply to shipments from a foreign country unless the "domestic segment of the shipment is covered by a separate domestic bill of lading," it has not directly answered the question whether the Carmack Amendment definitely will apply if there is a separate domestic bill of lading.  However, it is noteworthy that the Sixth Circuit cited *Swift Textiles, Inc. v. Watkins Motor Lines, Inc.*, 799 F.2d 697, 701 (11th Cir. 1986) for the above proposition, and the Swift Court specifically held that:

> when a shipment of foreign goods is sent to the United States with the intention that it come to final rest at a specific destination beyond its port of discharge, then the domestic leg of the journey (from the port of discharge to the intended destination) will be subject to the Carmack Amendment as long as the domestic leg is covered by separate bill or bills of lading.

(Emphasis added).  The Swift court's language suggests that, at least in the Eleventh Circuit's view, Carmack definitely will apply to the domestic portion of an overseas shipment if there is a separate bill of lading for the domestic portion of the journey.  At least one other Circuit Court has stated the same.  See *Duck Head Footwear v. Mason & Dixon Lines, Inc.*, 2002 WL 1733778 at *3 (4th Cir. 2002) ("Where a separate bill of lading is issued to cover the domestic leg of a shipment of foreign goods to a place in the United States, the [Carmack] Amendment covers that domestic leg.").

Given the Sixth Circuit's reliance on Swift's language for the proposition that Carmack does not apply unless there is a separate domestic bill of lading and other Circuit Courts' interpretation of the same language, it appears that the Carmack Amendment should apply where - as in this case - the overland carrier issues its own separate domestic bill of lading to cover its portion of the journey.  However, ATS has complicated matters by invoking COGSA, as described below.

### 2.  The Hapag-Lloyd bill of lading and COGSA

In its motion for summary judgment, ATS argues that COGSA and its corresponding liability limitations apply in this case because the Hapag-Lloyd bill of lading contains a Himalaya clause, which extends the application of COGSA and the liability limitations contained within the Hapag-Lloyd bill of lading to downstream carriers such as ATS.  (*See e.g.*, doc. 44, at 15).

COGSA is a negligence-based scheme which applies to "all contracts for carriage of goods by sea to or from ports of the United States in foreign trade."  46 U.S.C. § 30701(13).  A carrier's liability under COGSA is limited to $500 per package.  *Id.* at § 30701(4)(5).  By its terms, COGSA applies only to the "tackle-to-tackle" period - that is, from the time the goods are loaded onto an overseas vessel until the time the goods are discharged from the vessel.  *Id.* at § 30701(1)(e); *Sompo Japan Ins. Co. v. Union Pacific Railroad Co.*, 456 F.3d 54, 58 (2d Cir. 2006).  However, COGSA

9

may apply "beyond the tackles" if the parties so agree. 46 U.S.C. § 30701(6)(7).  COGSA may even apply to the domestic, inland portion of an overseas shipment to a destination in the United States if the shipment is governed by single through bill of lading containing a Himalaya clause extending the liability limitations of the bill of lading under COGSA to downstream carriers. *Altadis*, 458 F.3d at 1292-94; *American Road*, 348 F.3d at 568-69;

### a. "Through" Bill of Lading

"A bill of lading issued in a foreign country to govern a shipment throughout its transportation from abroad to its final destination in the United States, is termed a 'through' bill of lading." *American Road*, 348 F.3d at 568 (quoting *Capitol Converting Equip., Inc. v. LEP Trans., Inc.*, 965 F.2d 391, 394 (7th Cir. 1992).  "Determining whether a shipment is governed by a through bill of lading is a question of fact." *Id.*  Relevant to the inquiry are: (1) whether the bill of lading indicates the final destination for the goods; (2) whether the freight for the entire shipment was prepaid; and (3) whether a separate, domestic bill of lading ever issued. *See id.*

The facts in this case suggest that the Hapag-Lloyd bill of lading is not a through bill of lading.  First, the Hapag-Lloyd bill of lading lists Rutil as the shipper; Carmichael as the consignee; and Custom Rubber under "Notify Address."  (Doc. 44, DX D).  Under "Vessel(s)," only Maersk Madrid (the ocean vessel) is listed.  (*Id.*, DX D).  The Hapag-Lloyd bill of lading lists "La Spezia" (in Italy) as the Port of Loading and "New York, NY" as the Port of Discharge.  (*Id.*, DX D).  Significantly, the space under "Place of Delivery" is left blank, and the Hapag-Lloyd bill of lading does not otherwise indicate that Cleveland is the final destination for the machine.  (*See id.*, DX D).  Second, although Custom Rubber may have prepaid for the shipment, it does not appear that Custom Rubber billed singularly for the entire shipment.  Basically, the shipping arrangement was as follows:

10

Custom Rubber and Rutil agreed that Rutil would be responsible for making the shipping arrangements and that Custom Rubber would pay for the shipment. (Braun Deposition, at 31). Rutil hired Nardi to make the shipping arrangements. Nardi then hired Hapag-Lloyd to ship the machine via ocean carrier from Italy to New York. (Doc. 46, at ¶ 5). There is an invoice from Nardi to Custom Rubber documenting the ocean freight. (Doc. 39, PX A-2). There also is an invoice from Carmichael to Custom Rubber for the ocean freight, as well as for some customs related charges. (Doc. 44, DX B). Nardi billed Carmichael for the shipment and then Carmichael billed Custom Rubber. (*See id.*, DX B). There is a *separate* invoice from Carmichael to Custom Rubber for the inland freight. (*Id.*, DX B). It appears from this invoice that Carmichael arranged with ALS separately to complete the overland portion of the journey from New Jersey to Cleveland, that ALS billed Carmichael for the inland freight, and that Carmichael then billed Custom Rubber. (*See id.*, DX B). ALS, in turn, hired ATS to serve as the actual motor carrier for the inland journey. (*Id.*, DX C, at ¶ 15). As noted above, it is undisputed that the motor carrier, ATS, issued its own separate bill of lading the cover the journey from New Jersey to Cleveland. (Doc. 39, PX A-6). These separate bills of lading and invoices suggest that the Hapag-Lloyd bill of lading was not intended to cover the entire shipment from Italy to Cleveland, and thus, that it is not a through bill of lading.

More importantly, it is ATS' burden to prove that the Hapag-Lloyd bill of applies to it in this case. In order to support its claim that the Hapag-Lloyd bill of lading extends downstream to ATS, ATS must present some affirmative evidence that the Hapag- Lloyd bill of lading is a through bill of lading. "Speculation, unsupported by facts in the record, is insufficient to create a genuine issue of material fact and falls short of what is required to survive summary judgment," let alone win as the moving party on a motion for summary judgment. *American Road*, 348 F.3d at 569 (quoting

11

*Anderson*, 477 U.S. at 252).  Yet, ATS does not even address in its motion whether or not the Hapag-Lloyd bill of lading is a through bill of lading, much less present any affirmative evidence supporting such a contention.  Thus, the Court finds that ATS has not met its burden with regard to this issue.

### b.  Himalaya Clause and Downstream Carriers

A Himalaya clause is a contractual provision extending maritime liability limitations to downstream carriers.  *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 20 (2004).  Where a Himalaya clause is present in the applicable bill of lading, neither traditional privity of contract nor a traditional agency relationship is required.  *Id.* at 34.  Yet, Himalaya clauses must be construed like any other contract - by their terms and consistent with the intent of the parties.  *Id.* at 31-32.

ATS does not indicate in its brief *where* in the Hapag-Lloyd bill of lading the alleged Himalaya Clause is; ATS simply declares that the Hapag-Lloyd bill of lading  contains a Himalaya Clause, and that the Himalaya clause - wherever it is - extends downstream to ATS. Notwithstanding ATS' somewhat curious failure to point out the Himalaya clause ATS so fervently argues applies to it, the Court finds that Paragraph 4 in the Hapag-Lloyd bill of lading, entitled "Subcontracting and Indemnity," constitutes a Himalaya clause.  Paragraph 4 provides:

> (1) The Carrier shall be entitled to sub-contract the Carriage on any terms whatsoever.
> (2) It is hereby expressly agreed that no Servant or Agent are, or shall be deemed, liable with respect to the Goods as Carrier, bailee, or otherwise.  Without prejudice to the foregoing, the Servants or Agents are intended as beneficiaries of all terms and conditions including the jurisdiction clause . . . .

(Doc. 44, DX D).  Under this clause, any servants and agents of the carrier are entitled to invoke all the terms and conditions contained within the Hapag-Lloyd bill of lading as beneficiaries thereof. Thus, Paragraph 4 clause constitutes a Himalaya clause.

ATS cites many cases for the proposition that it is entitled to enjoy the benefits of the Hapag-

Lloyd bill of lading and its Himalaya clause.  In each of the cases that ATS cites for this proposition, however, the overland carriers were hired either by an ocean carrier that issued a bill of lading containing a COGSA limitation and Himalaya clause, or by a non-vessel operating carrier that issued its own bill of lading containing COGSA limitation and a Himalaya Clause to cover the entire voyage.  *See Am. Home Assurance v. Hapag-Lloyd Container Lines*, 446 F.3d 313 (2d Cir. 2006) (in a multi-modal international shipment, Hapag-Lloyd hired Matson to arrange for goods to be shipped from Chicago to Long Beach; Matson hired BNSF to physically transport goods; court found that "given the sole purpose of the agency relationship between Matson and Hapag-Lloyd was to arrange for the transportation of the engines on Hapag-Lloyd's behalf, it is clear that BNSF was '*employed by*' Hapag-Lloyd and thus entitled to limit its liability to $500 pursuant to the Himalaya clause.") (emphasis added); *Mitsui Marine & Fire Ins. Co., Ltd. v. Hanjin Shipping Co., Ltd.*, 632 S.E.2d 467 (Ga. App. 2006) (a shipper hired a freight forwarder; the freight forwarder issued a bill of lading containing COGSA limitations and Himalaya clause; the freight forwarder hired Hanjin to ship cargo overseas; Hanjin hired Norfolk Southern for overland leg; and the court held that Norfolk Southern was entitled to invoke the Himalaya clause contained in freight forwarder's bill of lading as a downstream beneficiary); *Royal & Sun Alliance Ins. v. Ocean World Lines, Inc.*, 2008 WL 3854556 (S.D.N.Y. 2008) (a shipper hired OWL to arrange a shipment of goods from Germany to Indiana; OWL issued a bill of lading containing COGSA limitations and Himalaya clause; OWL hired Yang Ming to transport the goods overseas; OWL arranged with Norfolk Southern to transport the goods from Virginia to Chicago and Djuric to transport goods from Chicago to Indiana; Djuric did not issue its own bill of lading; and the court held that Djuric and Yang Ming were entitled to take advantage of the liability limitations in the OWL bill of lading); *Mazda Motors of Am., Inc. v.*

13

*M/V COUGAR ACE*, 2007 WL 2344934 (D. Ore. 2007) (plaintiffs shipper and subrogated insurer brought an action against the sailing vessel, COUGAR ACE, that was carrying the cargo when the damage to cargo occurred; and the court held that the COUGAR ACE was entitled to invoke the liability limitation contained in the bills of lading either: (1) as an actual party to the bills of lading by ratification - i.e., by sailing with the cargo, or (2) as an intended third-party beneficiary under the Himalaya clause); *Limited Brands, Inc. v. Flying Cargo Intl. Trans. Ltd.*, 2006 WL 783459 (S.D. Ohio 2006) (plaintiff shipper hired Flying Cargo to make shipping arrangements; Flying Cargo, in turn, hired Danmar to make shipping arrangements; Danmar issued several through bills of lading containing Himalaya clauses; Danmar hired ZIM Container for ocean freight and Cargo Connections for the overland transport; Cargo Connections hired Palmer for overland carriage; and the court held that Cargo Connections and Palmer could benefit from the Danmar bill of lading limitations); *Kirby*, 543 U.S. 14 (2004) (*see below*).

In *Kirby*, the cargo owner hired ICC to arrange for the shipping of machinery from Australia to Alabama. *Id.* at 18-19. ICC issued Kirby a bill of lading containing the COGSA default liability limitation of $500 per package for the sea leg and a higher amount for the land leg. *Id.* at 19-20. The bill of lading also contained a Himalaya clause. *Id.* ICC hired Hamburg Sud to ship the machinery by sea to Savannah, Georgia. *Id.* at 21. Hamburg Sud issued its own bill of lading containing the COGSA liability limitation and a Himalaya clause extending the liability limitation to downstream carriers. *Id.* Hamburg Sud then hired Norfolk Southern to carry the machinery overland from Savannah to Alabama via train. *Id.* The train derailed and the machinery was damaged. *Id.* Kirby sued Norfolk Southern. *Id.* The Supreme Court held that Norfolk Southern was entitled to take advantage of the liability limitations in both the ICC and Hamburg Sud bills of lading. *Id.* at 36.

Since the Hamburg Sud bill of lading applied and contained a lower liability limitation, Norfolk Southern could use it to limit its liability. *Id.* at 34-35.  Notably, in this case, *Hamburg Sud hired Norfolk Southern*.  Therefore, it makes sense that Norfolk Southern, as an agent or servant of and a carrier directly downstream from Hamburg Sud, would get to invoke the liability limitation.  Also notable is that fact that the Carmack Amendment was not at issue in *Kirby*.  *See Kirby*, 543 U.S. 14; *Sompo*, 456 F.3d at 74 (explaining that since "the cargo owner failed to raise the issue of Carmack's applicability . . . the only issue before the [*Kirby*] Court was the interaction between *state* law and contractual provisions extending COGSA's terms to a rail carrier").

Yet, the situation in *Kirby* and the other cases ATS cites do not mirror what happened in this case.  Here, the undisputed facts show that Rutil hired a freight forwarder, Nardi, on behalf of Custom Rubber to arrange the shipment of the Rutil press.  (Braun Deposition, at 12-13).  Nardi made further arrangements with Carmichael.  (Doc. 46, at ¶ 6; doc. 44, DX B, at ¶¶ 7, 8).  Nardi arranged with Hapag-Lloyd and ALS *separately* to ship the machine (Doc. 46, at ¶¶ 5, 8; doc. 44, DX B, C).  Hapag-Lloyd issued a bill of lading to cover the sea leg.  (Doc. 44, DX D).  ALS arranged with ATS to transport the machine overland.  (*Id.*, DX C).  ATS issued a bill of lading to cover the overland leg.  (Doc. 39, PX A-6).  *Neither Nardi nor Carmichael issued a bill of lading.* Accordingly, it appears that each of the two bills of lading that issued in this case were meant to cover separate parts of the machine's voyage.

Moreover, *Hapag-Lloyd did not hire ALS or ATS.*  (Doc. 44, DX C, at ¶¶ 8-11, 15).  Hapag-Lloyd and ATS simply have no connection with one another besides the fact that they were both hired by the same freight forwarder - notably, one that did not issue its own bill of lading.  ATS argues that because Nardi hired both ALS and Hapag-Lloyd, ALS is carrier downstream from

Hapag-Lloyd, and since ALS hired ATS, ATS is entitled to take advantage of the Hapag-Lloyd Himalaya clause.  (Doc. 44, at 14).  This statement does not accurately reflect the facts.  ALS is downstream from Nardi, not Hapag-Lloyd.  Furthermore, under *Kirby*, Himalaya clauses must be interpreted like any other contract term.  *Kirby*, 543 U.S. at 31-32.  Paragraph 4 of the Hapag-Lloyd bill of lading extends the liability limitations of the Hapag-Lloyd bill of lading to *servants and agents* of Hapag-Lloyd.  (*See* doc. 44, DX D).  ATS offers no evidence indicating that it was employed by Hapag-Lloyd, that it contracted or subcontracted with Hapag-Lloyd, or that it otherwise has any connection with Hapag-Lloyd.  In the absence of any such evidence, the Court cannot see how Paragraph 4 applies to ATS.

In *Reider v. Thompson*, 339 U.S. 113 (1950), the petitioner sued the respondent trustee of the railroad company that transported its goods, alleging that petitioner's goods were in good condition upon arrival in New Orleans, and damaged when the goods arrived by train in Boston.  The shipment originated in Buenos Aires, and was transported from Buenos Aires to New Orleans on an ocean bill of lading.  *Id.* at 115.  The shipment was then transported by train from New Orleans to Boston.  *Id.* at 116.

The ocean bill of lading listed "Buenos Aires" under "Port of Shipment;" "New Orleans" under "Port of Discharge;" was left blank under "Destination of the Goods;" and recited that "Notice of arrival should be addressed to" the petitioner.  *Id.*  The respondent issued its own bill of lading for the domestic portion of the journey from New Orleans to Boston.  *Id.*  The Court of Appeals held that the domestic bill of lading issued by the respondent was "supplemental" to the ocean bill of lading and that the Carmack Amendment was not meant to apply to the domestic portion of the "through foreign shipment."  *Id.*  But the Supreme Court reversed, stating:

16

Does the fact that the shipment in this case originated in a foreign country take it without the Carmack Amendment? We think not.  There was no through bill of lading from Buenos Aires to Boston.  The record does not show the slightest privity between respondent and the ocean carrier.  The contract for ocean transportation terminated at New Orleans.  Having terminated, nothing of it remained for the new, separate, and distinct domestic contract of carriage to 'supplement' . . . . If the various parties dealing with this shipment separated the carriage into distinct portions by their contracts, it is not for courts judicially to meld the portions into something they are not.  The test is not where the shipment originated, but where the obligation of the carrier as receiving carrier originated.

*Id.* at 117.

The facts of this case are much closer to those in *Reider* than to those in *Kirby* or any of the other cases ATS cites. Although the parties to this shipment obviously contemplated that the press would need to be transported all the way from Italy to Cleveland, essentially two separate bills of lading to cover two separate legs issued in this case - much like the situation in *Reider*.  As stated above, Nardi, the freight forwarder, did not issue its own bill of lading to cover the shipment. Hapag-Lloyd did not hire ATS or ALS.  ATS has failed to establish any discernible connection with Hapag-Lloyd other than the fact that both entities were hired by Nardi.  The Court finds that ATS has failed to show: (1) why the Hapag-Lloyd bill of lading is a through bill of lading; and (2) why ATS is a carrier downstream from Hapag-Lloyd or otherwise sufficiently connected with Hapag-Lloyd to enjoy the benefits of its bill of lading.

Since ATS has failed to demonstrate why the Hapag-Lloyd bill of lading applies to this case, the Court finds that COGSA and its applicable liability limitation cannot govern. Moreover, the Court is persuaded that, under *Swift* and *American Road*, the Carmack Amendment should apply to the domestic leg of an international shipment where the domestic leg is covered by a separate bill of lading.  As described above, ATS issued a bill of lading to cover the machine's overland journey

17

from New Jersey to Cleveland.  Therefore, the Carmack Amendment properly applies to this case.

### B.  Whether ATS is Liable Under the Carmack Amendment

Custom Rubber argues that it is entitled to summary judgment based on ATS' liability under the Carmack Amendment.  (Doc. 39, at 6).  In order to establish a prima facie case under the Carmack Amendment, a plaintiff must prove three things: (1) delivery of the goods in question to the carrier in good condition; (2) arrival in damaged condition; and (3) the amount of damages caused by the loss.  *Plough, Inc. v. Mason & Dixon Lines*, 630 F.2d 468, 470 (6th Cir. 1980) (citing *Missouri Pacific R. R. v. Elmore & Stahl*, 377 U.S. 134, 138 (1964)).  Once a plaintiff establishes the prima facie case, the carrier will be liable unless it can establish that it was free from negligence and that the damage was caused solely by: "(a) the act of God, (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods."  *Id.* (citing *Elmore*, 377 U.S. at 137).

Custom Rubber's motion for summary judgment includes affirmative evidence establishing each of the three required elements listed above.  First, Custom Rubber points to the deposition testimony of Michael Loghry to show that the machine was delivered to ATS in good condition.  Mr. Loghry testified that the Rutil Press was in good condition when he picked it up, that there was no damage, and that "[i]it looked like a brand new machine."  (Loghry Deposition, at 47-48, 23-24).  Custom Rubber also points to Mr. Loghry's testimony to show that the machine was damaged while in the custody of ATS's employee, after delivery to ATS and before arrival at Custom Rubber's place of business.  Mr. Loghry testified that the trailer and machine tipped over when he made a U-turn trying to get into the parking spot he wanted at a truck stop in Pennsylvania.  (*Id.*, at 71-75).

18

Finally, Custom Rubber presents the affidavit of Charles Braun[1] and accompanying exhibits, including invoices reflecting the cost of repairing, storing, shipping the damaged machine back to Italy, to show the amount of damages.  (Doc. 46, at ¶ 14; doc 39, PX A-7 - 9).  Thus, Custom Rubber has established a prima facie case of liability under the Carmack Amendment.

ATS claims that it is not responsible for the damage to the Rutil press because a latent loading defect, rather than any activity on the part of ATS, must have caused the trailer to tip over. ATS states in its opposition to Custom Rubber's Motion for Summary Judgment that:

> Mr. Loghry testified that the Press was completely secured, with all the securement he had available.  Thus, lack of securement could not have caused the tipping.  The tipping of the trailer [] and the Press [] must have been caused by a defect in the loading, and it is undisputed that the defect was not obvious or apparent to Mr. Loghry.

(Doc. 52, at 5).  ATS further states that "[i]t is well settled that when a shipper assumes the responsibility for loading, carriers, such as ATS, are liable for injuries and damage from improper loading *only* where the loading defects are apparent."  (*Id.* at 10) (citing *United States v. Savage Truck Line, Inc.*, 209 F.2d 442 (4th Cir. 1953).  Although ATS does not specifically so state in its briefs, presumably ATS offers these statements to show that it was free from negligence and or that the damage at issue here was caused solely by the "act of the shipper himself"

The Court does not find ATS's arguments persuasive.  First, ATS offers no affirmative evidence suggesting that a loading defect caused the trailer to tip.  ATS merely argues that because Mr. Loghry used all the "securement" - i.e., ties and chains to hold the machine down to the bed of the trailer - he had and felt the load was secure, a loading defect *must* have caused the trailer to tip. As Custom Rubber points out, this argument overlooks the possibilities that Mr. Loghry in fact

---

[1]Charles Braun is the president of Custom Rubber.

improperly secured the load (despite using all his securement and his feelings to the contrary), that Mr. Loghry took the turn into the parking space too sharply or too fast, that ATS opted to use the wrong kind of trailer - e.g., a standard trailer with too high a bed instead of a stabler "low-boy" trailer - to transport the load, or that something else caused the accident.  Mr. Loghry himself testified at one point that he thought the sharp turn caused the trailer to tip.  Second, as Custom Rubber argues, even if a loading defect caused the trailer to tip, and even if Mr. Loghry did not himself physically load the machine onto the trailer, Mr. Loghry directed both the initial loading and the later repositioning of the machine.  (Loghry Deposition, at 28, 60-63).  Since the machine was loaded onto the trailer both times at the direction of ATS' employee, ATS arguably is liable for any alleged loading defect.  Third, even if a loading defect caused the trailer to tip, and even if the defect was latent, according to the very case law ATS cites ATS' responsibility for the damage to the machine shifts to Custom Rubber *only* if Custom Rubber *assumed* responsibility for the loading of the press. Nowhere in its briefs does ATS even allege, must less prove, that Custom Rubber assumed responsibility for the loading of the machine.  As explained above, Custom Rubber established a prima facie case under the Carmack Amendment.  In order to avoid liability, therefore, ATS must do two things: (1) show that it was not negligent; and (2) establish that the cause of the damage was one of the five exceptions listed above.  ATS has done neither.  Therefore, the Court finds that ATS is liable under the Carmack Amendment.

### C.  Whether the Liability Limitation in the ATS Bill of Lading Applies

A carrier may limit its liability under the Carmack Amendment if it meets four requirements:

20

(1) maintain approved tariff rates with the ICC;[2] (2) give the shipper a fair opportunity to choose between two or more levels of liability; (3) obtain the shipper's written agreement as to his choice of liability; and (4) issue a receipt or bill of lading prior to moving the shipment. *Toledo Ticket Co. v. Roadway Express, Inc.*, 133 F.3d 439, 441-42 (6th Cir. 1998). The *Toledo Ticket* court stated that in order to comply with requirement (2), "a carrier must provide the shipper with both reasonable notice of any options that would limit the liability of the carrier and the opportunity to obtain the information about those options that will enable the shipper to make a deliberate and well-informed choice." *Id.* It also stated that:

> In order to provide the shipper with the reasonable notice that will permit the carrier to limit its liability, we believe the carrier must bring to the attention of the shipper its option to choose between levels of liability, whether or not the shipper is 'sophisticated' . . . . Accordingly, a carrier will comply with the fair opportunity to choose requirement if its notice to the shipper sets out the levels of coverage from which the shipper can choose and includes a clear statement that by opting for a lower shipping rate the carrier's liability for loss will be limited.

*Id.* at 443. The carrier has the burden to prove that it has satisfied each of the four requirements.

Custom Rubber argues that the liability limitation contained within ATS' bill of lading does not effectively limit ATS' liability because Defendant failed to comply with the second and fourth requirements outlined above. Custom Rubber claims that it was not given "a fair opportunity to

---

[2]Since the ICC is now defunct, *see* Pub.L. No. 104-88, tit. I, § 103, ch. 147 sec. 14706, 109 Stat. 907-10 (popularly named the "Interstate Commerce Commission Termination Act of 1995"), the requirement that a carrier maintain an approved tariff rate with the ICC has been replaced with the requirement that a carrier provide to the shipper a copy of the tariff if the shipper requests it. *See* 49 U.S.C. § 14706(c)(1)(B). Although the Sixth Circuit has not addressed the issue, many federal courts have held that the new requirement does not abrogate or otherwise alter any of the remaining three requirements. *See e.g.*, *Emerson Elec. Supply Co. v. Estes Express Lines Corp.*, 451 F.3d 179, 181 (3d Cir. 2006); *Sassy Doll Creations, Inc. v. Watkins Motor Lines, Inc.*, 331 F.3d 834 (11th Cir. 2003).

choose between two or more levels of liability" - the second *Toledo Ticket* requirement - because it did not have a chance to review ATS' bill of lading until after the damaged machine was delivered to it and did not receive notice of any of the liability limitations contained within the bill of lading prior to delivery.  (Doc. 50, at 9).  Custom Rubber also claims that ATS' bill of lading was not issued to it prior to the shipment, in contravention of the fourth *Toledo Ticket* requirement.  In support of this claim, Custom Rubber points to the fact that its only signature on the bill of lading appears under "Delivery Receipt" as evidence that it neither saw nor signed ATS' bill of lading until after the machine delivered.  (*Id.* at 9-10).

ATS argues that the liability limitations in ATS' bill of lading bind Custom Rubber because of the agency relationships between the parties and other entities involved in the shipment.  ATS argues that ALS was Custom Rubber's agent because Custom Rubber hired Nardi, which hired ALS, which in turn hired ATS.  (Doc. 59, 11-12).  According to ATS, ALS was acting as Custom Rubber's agent when it hired ATS.  (*Id.*, at 11).  ATS further claims that ALS was aware of the liability limitations contained within the ATS bill of lading because of its longstanding relationship with ATS, and therefore, ALS entered into the agreement with Defendant with full knowledge of its terms.  (*Id.*, at 11-12).  Therefore, Custom Rubber is bound by the terms of the agreement that ALS entered into with ATS on its behalf.

Under Ohio law, "[a]gency is the fiduciary relation which results from (1) the manifestation of consent by one person to another that other shall (2) act on his behalf and (3) subject to his control, and (4) consent by the other so to act."  *Pavlovich v. Natl. City Bank*, 435 F.3d 560 (6 th Cir. 2006) (quoting *Berge v. Columbus Cmty. Cable Access*, 136 Ohio App.3d 281, 736 N.E.2d 517, 531 (Ohio App. 10 Dist. 1999)).  Where an agency relationship is created between a principal and an

22

agent, the agent may act in his principal's affairs "in accordance with the principal's manifestation of assent."  *See* *Thropp v. Bache Halsey Stuart Shields, Inc.*, 650 F.2d 817, 819 (6th Cir. 1981).  It is well established under agency law that notice or knowledge to the agent, with few exceptions, shall be imputed to the principal when the agent "is acting within the scope of his authority and the knowledge pertains to matters within the scope of the agent's authority."  *Ford Motor Credit Co. v. Weaver*, 680 F.2d 451, 457 (6th Cir. 1982).

The parties do not dispute that Custom Rubber arranged with Rutil to transport the machine from Italy to Cleveland.  Charles Braun testified in his deposition that although he did not specifically discuss with Maurizio Coscia[3] transportation arrangements when ordering the Rutil press, the two companies had an understanding about how the arrangements would work.  (Braun Deposition, at 30-31).  Mr. Braun stated: "[e]very machine we've ordered from Rutil in the past, the transportation was our responsibility to pay for, but *Rutil's responsibility to coordinate*." (*Id.*) (emphasis added).  This statement suggests that Custom Rubber gave Rutil very broad authority to act on its behalf in transporting the machine from Italy to Cleveland.  It does not reflect that Custom Rubber wished to place any restrictions on what Rutil could do regarding the transportation of the machine or that Custom Rubber had any particular desires regarding shipping terms.

The facts show that Rutil, as Custom Rubber's agent, then made shipping arrangements with Nardi, and that Nardi made arrangements with ALS under its power as Rutil's - and, by extension, Custom Rubber's - agent.  Custom Rubber does not dispute these agency relationships or suggest that these agency relationships were in any way restricted or qualified.  ATS also presents affirmative

---

[3]Maurizio Coscia is one of Custom Rubber's contacts at Rutil and the person with whom Charles Braun spoke about ordering the machine.

evidence establishing the relationship between ALS and ATS, including the affidavit of Joseph McEvoy, the sole proprietor of ALS.  (*See* doc. 44, DX C).  Mr. McEvoy's affidavit states that ALS and ATS regularly do business with each other and that he was well aware of the liability limitation contained within ATS' bill of lading when ALS arranged with ATS to transport the press.  (*Id.* at ¶ 21).  Custom Rubber does not dispute either ALS' relationship with ATS or ALS' knowledge of the liability limitation.  Thus the undisputed facts show that ALS entered into the contract for shipping with ATS on behalf of Custom Rubber with full knowledge of the terms of ATS' bill of lading.

Custom Rubber complains that it was not given a fair opportunity to choose between shipping terms and that it did not have the chance to review the ATS bill of lading prior to shipment. But Custom Rubber ostensibly gave up these rights when it gave to Rutil the broad authority to act on its behalf in making the shipping arrangements for the machine.  If Custom Rubber wanted to negotiate shipping terms, it could have arranged for the shipment itself.  Instead, "it was Rutil's responsibility to coordinate" the transportation of the machine, (Braun Deposition, at 31-32), and the arrangement between Rutil and Custom Rubber spawned, of necessity, a series of other contracts and agency relationships over which Custom Rubber chose to have little to no control.  ALS had authority to enter into a contract on Custom Rubber's behalf based on Custom Rubber's grant of authority to Rutil, Rutil's grant of authority to Nardi, and Nardi's grant of authority to ALS. Accordingly, ALS had the authority to bind Custom Rubber to the ATS bill of lading.  ATS presents evidence showing that ALS had prior knowledge of the liability limitation contained with the ATS bill of lading, and that ALS had seen the ATS bill of lading prior to shipment.  (Doc. 44, DX C, at ¶¶ 17-22).  The Court finds that under the circumstances of this case, where Custom Rubber passed along to Rutil and the other downstream entities its right to negotiate shipping terms, ALS' regular

course of conduct with ATS and knowledge of the ATS bill of lading and its liability limitation is enough to satisfy the requirements of *Toledo Ticket*.  Accordingly, Custom Rubber is bound to the ATS bill of lading and its corresponding liability limitation.  The ATS bill of lading limits ATS' liability to $2.50 per pound and lists the weight of the Rutil press as 55,114 pounds.  (Doc. 39, PX A-6).  Therefore, the ATS bill of lading limits Custom Rubber's recovery to $137,785.00.

### D.  Whether the Collateral Source Rule Applies

The collateral source rule is a rule of evidence, under which "the plaintiff's receipt of benefits from sources other than the wrongdoer is deemed irrelevant and immaterial on the issue of damages." *Schlegel v. Song*, 493 F.Supp.2d 928, 920 (N.D. Ohio 2006) (quoting *Robinson v. Bates*, 112 Ohio St.3d 17, 21, 857 N.E.2d 1195).  Where the collateral source rule applies, "compensation from an independent source should not be deducted from the award of damages." *Rawlins Construction, Inc. v. Downes*, 225 F.3d 659 (Table), 2000 WL 977355 at *1 (6th Cir. 2000).  The collateral source rule normally applies in tort actions, but typically does not apply in actions for breach of contract.  *See* 22 Am. Jur. 2d § 394 (West 2008).

ATS argues that the collateral source rule does not apply to Custom Rubber's recovery in this case because this is an action for breach of contract, not a tort action.  (Doc. 44, at 24-25).  ATS cites a number of cases for the proposition that the collateral source rule is inapplicable in contract cases; however none of the cases ATS cites is a Carmack Amendment case.  *See Grover v. Ratliff*, 586 P.2d 213 (Ariz. Ct. App. 1978) (declining to apply the collateral source rule in breach of contract case regarding the sale of a mobile home subsequently destroyed by fire); *Garofalo v. Empire Blue Cross and Blue Shield*, 67 F.Supp.2d 343 (S.D.N.Y. 1999) (declining to apply New York collateral source in an ERISA case); *Midland Mut. Life Ins. Co. v. Mercy Clinics, Inc.*, 579 N.W.2d 823 (Iowa 1998)

(declining to apply collateral source rule in pure contract action involving borrower's alleged breach of estoppel agreement with lender); *Plut v. Fireman's Fund Ins. Co.*, 85 Cal App. 4th 98 (Cal. Dist. App. 2000) (declining to apply the rule in action brought by insureds against their property insurer for breach of contract); *N.A. v Symington*, 3 P.3d 1101 (Ariz. Ct. App. 2000) (declining to apply the rule in action to recover deficiency after foreclosure sale).

Custom Rubber argues that the collateral source rule does apply in this case, and that therefore, ATS is not entitled to a set off for the $95,000 Custom Rubber received from its insurer for damages to the machine.  (Doc. 39, 9-10).  Custom Rubber cites a couple of cases for the proposition that the collateral source rule applies in transportation contract cases - one Carmack Amendment case and one COGSA case.

In the Carmack Amendment case, *Anton v. Greyhound Van Lines, Inc.*, 591 F.2d 103 (2d Cir. 1978), the court held that the defendant was not entitled to set off from the damages awarded against it proceeds that the plaintiff - a retired colonel - had received from the government for the loss of her belongings.  In that case, many of the plaintiff's belongings were damaged by fire en route from Alabama to New Hampshire.  *Id.* at 105.  After the loss, the plaintiff filed a claim against the government under 31 U.S.C.  §§ 240-43 and received $10,000.  *Id.* at 106.  The plaintiff then filed suit against Greyhound for the full value of her lost belongings and assigned $10,000 of any award she received to the government.  *Id.*  After a jury trial, the plaintiff received a judgment in the amount of $10,509.06.  *Id.* at 106-07.  Greyhound moved to reduce the judgment by $10,000 - the amount the plaintiff received from the government - but the district court denied the motion. Greyhound appealed and the First Circuit affirmed.  *Id.*  The First Circuit stated that the proceeds the plaintiff received from the government were in the nature of insurance proceeds and that, as such,

26

the collateral source rule applied to prevent Greyhound from reducing its damages by $10,000.  *Id.* at 109.  The Court further reasoned that applying the collateral source rule was equitable in that case because the plaintiff was contractually obligated to return the $10,000 to the government and because the plaintiff's receipt of government proceeds for her loss had no bearing on Greyhound's liability. *Id.* at 109-10.

In the COGSA case, *Texport Oil Co. v. M/V Amolyntos*, 11 F.3d 361 (2d Cir. 1993), the Second Circuit affirmed the district court's application of the collateral source rule.  In that case, the plaintiff incurred significant expense processing gasoline that had been contaminated or discolored as a result of being transported on the defendant ship.  *Id.* at 364.  The plaintiff filed an insurance claim to help cover its processing expenses and received proceeds in the amount of $650,000 in addition to whatever subrogation rights the insurer had against the defendant.  *Id.*  The plaintiff then filed suit against the defendant and received a judgment of $180,410.33 in incidental damages and prejudgment interest.  *Id.*  The defendant argued on appeal that it should be entitled to set off the amount the plaintiff received from its insurer against the amount of damages.  *Id.* at 367.  According to the defendant, the collateral source rule should not have applied because COGSA actions are essentially contract actions.  *Id.*  However, the Second Circuit agreed with the district court that: "[t]his action under COGSA is a maritime action in the nature of a mixed tort, contract and bailment cause of action . . . Furthermore, the fact that [the plaintiff] entered into an independent contract with a third party insurer to indemnify any loss does not insulate [the defendant] from full liability. " *Id.* It continued:

> The proper question to ask in these circumstances is who should receive the windfall if Texport wins on its insurance claim? - the wronged or the wrongdoer?  Clearly, [the plaintiff], as the wronged party, should benefit from the insurance for which it

paid when purchasing [the goods].  Furthermore, by assigning that right to [the plaintiff], we do not impose a double burden on the [defendant] since the [defendant] did not pay for the insurance.

*Id.*  Both *Anton* and *Texport* have been overruled on other grounds.  *See Hollingsworth & Vose Co. v. A-P-A Transp. Corp.*, 158 F.3d 617 (1st Cir. 1998); *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995).

There are no cases from the Sixth Circuit indicating whether or not the collateral source rule should apply in Carmack Amendment cases; thus this appears to be an issue of first impression. Whether the collateral source rule should apply depends on how one characterizes this action under the Carmack Amendment.  If the action is treated as a straight breach of contract case, then the rule should not apply; but the rule should apply if this is an action in the nature of tort.

In support of its argument that the collateral source rule should not apply in this case because this case is about a breach of contract, ATS makes much of the fact that the Court has already dismissed Custom Rubber's negligence claim.  ATS argues that because the Court found that Custom Rubber's negligence is preempted by the Carmack Amendment, the Court necessarily found that this case does not involve a cause of action in tort, only one for breach of contract. (Doc. 44, at 25).  Yet, the Carmack Amendment was intended to preempt "causes of action against an interstate motor carrier for fraud, tort, [and]  intentional and negligent infliction of emotional distress" in addition to actions for breach of contract.  *Automated Window Machinery, Inc. v. McKay Ins. Agency, Inc.*, 320 F.Supp.2d 619, 620 (N.D. Ohio 2004).  Contrary to ATS' suggestion, therefore, the mere fact that a cause of action is preempted by the Carmack Amendment does not necessarily make it one sounding in breach of contract.  (Doc. 44, at 25).

28

This case arises from the damage caused to Custom Rubber's machine while in ATS' custody and very likely due to the negligent actions of ATS and or its employee.  Although liability for the shipment at issue was covered by a bill of lading - i.e., a contract - bills of lading are required under the Carmack Amendment, and this fact alone should not change the nature of the cause of action. The main thrust of this action is negligence.  *Cf. Am. Synthetic Rubber Corp. v. Lousiville & N.R. Co.*, 422 F.2d 462, 466 (6th Cir. 1970) (held that case arising out of the *mis-delivery of chemicals* was encompassed by the Carmack Amendment and was a cause of action sounding in breach of contract, not tort).  Therefore, the collateral source rule should apply, and ATS is not entitled to set off against the award of damages any of the $95,000 Custom Rubber received from its insurer.

### E.  The Amount of Custom Rubber's Damages

ATS argues that under Carmack, the amount of Custom Rubber's damages, if any, is limited to the difference between the fair market value of the machine when it left Italy and the fair market value when the machine arrived in Cleveland.  (Doc. 44, at 17-19).  Custom Rubber argues that the Carmack Amendment allows it to recover, among other damages, the cost of repairing the machine. (Doc. 39, at 4, 10).

Under the Carmack Amendment, a plaintiff can recover for "actual loss."  Normally, "actual loss" is determined by deducting the salvage value of the damaged goods at destination from the fair market value of the goods when the goods came into the custody of the carrier.  Although the Sixth Circuit has not directly spoken on the issue, at least one court within the Sixth Circuit has stated that a plaintiff in a Carmack Amendment case may recover the costs of repairing its damaged goods instead of the reduction in market value at destination.  *See Zurich North Am. (Canada) v. Triple Crown Serv. Co.*, 2008 WL 4642864 (E.D. Mich. 2008); *Logistics Insight Corp. v. JDL Trucking,*

*L.L.C.*, 2006 WL 374752 at *3 (E.D. Mich. 2006).  *See also Camar Corp. v. Preston Trucking Co., Inc.*, 221 F.3d 271, 277 (1st Cir. 2000) ("Within the meaning of the Carmack Amendment, 'actual loss or injury to the property' is ordinarily measured by the reduction in market value at destination or by replacement or repair costs occasioned by the harm.").  Custom Rubber has presented affirmative evidence that the costs of repairing the machine were $180,412.21.  (Doc. 46, at ¶ 14).  ATS does not dispute Custom Rubber's claims as to the amount of the machine's repair costs.  Under the circumstances of this case - where the costs of repairing the machine are readily ascertainable and a fairly reliable indicator of the reduction in market value at destination - the Court finds it reasonable to use the costs of repair as the basis for determining the amount of Custom Rubber's damages.

Custom Rubber also argues that it is entitled to recover special or consequential damages for the costs of storing, rigging, and re-transporting the machine back to Italy for repairs.  (Doc. 39, at 4, 10).  ATS argues that Custom Rubber cannot recover any special or consequential damages because ATS never had reason to know that Custom Rubber allegedly would incur such damages.  (Doc. 44, at 20-22).

The Sixth Circuit has stated that "even though the cause of action arises under the contract of carriage and is covered by the Carmack Amendment, recovery of special or consequential damages is not necessarily precluded." *Synthetic Rubber*, 422 F.2d at 467 (citing *Marquette Cement Manufacturing Co. v. Louisville & N.R. Co.*, 281 F.Supp. 944, 948 (E.D. Tenn. 1967).  The *Synthetic Rubber* court continued: "[a]lthough special damages were denied in *Marquette* because they were not 'reasonably foreseeable,' the test governing recovery of such damages is correctly stated in the opinion of the district judge in that case." *Id.*  As the district judge in *Marquette* stated, "[t]he

30

Carmack Amendment did not alter the common law as to special damages: knowledge is a prerequisite for liability." *Marquette Cement Manufacturing Co. v. Louisville & N.R. Co.*, 281 F.Supp. 944, 948 (E.D. Tenn. 1967).  "'To render the connecting carrier liable either to the initial carrier or to consignor or consignee for special damages arising from delay which are not the ordinary, natural consequences of delay the connecting carrier must have notice [of the circumstances giving rise to the special damages] at or before receiving the shipment and undertaking the carriage.'" *Id.*

Under *Synthetic Rubber* and *Marquette*, Custom Rubber must establish that ATS "had reasonable notice or knowledge of the special conditions rendering such damages the natural and probable result of the breach" in order to recover special or consequential damages. *Marquette*, 281 F.Supp. at 950.  Custom Rubber claims that it is entitled to consequential damages because "[i]t is reasonably foreseeable that one would incur additional expenses to repair a product produced in a foreign country, including shipping, rigging, and duty fees." (Doc. 50, at 12).  The question, however, is not simply whether such damages are reasonably foreseeable, but whether ATS had reasonable notice or knowledge *at the time of agreeing to ship the machine* that the expenses Custom Rubber now claims would stem naturally from any breach ATS committed.  Although ATS knew or should have known based on the bills of lading that the machine originated in a foreign country, the facts do not clearly indicate whether or not ATS can be charged with notice as of the time it entered into the agreement that Custom Rubber would incur expenses rigging, storing, re-shipping, and paying a duty deposit if ATS breached the agreement.  Thus, the Court finds that there are issues of material fact precluding summary judgment in favor of Custom Rubber on the issue of consequential damages.

However, the Supreme Court has held that a limitation on damages contained within the applicable tariff or bill of lading applies to *all* damages, and no recovery can be had in excess of the amount provided by its terms.  *Southeastern Express Co. v. Pastime Amusement Co.*, 299 U.S. 28, 29-30 (1936); *see also Tayloe v. Kachina Moving & Storage, Inc.*, 16 F.Supp.2d 1123, 1131 (D.Ariz. 1998) (holding that even though there was a genuine issue of material fact as to whether or not the defendants had notice of special circumstances giving rise to the plaintiff's claim for special and consequential damages, the defendant carrier effectively limited its liability to $100,000 via the liability limitation contained within its bill of lading).  As explained above, ATS effectively limited its liability to $137,785.00 by way of the liability limitation contained within its bill of lading.  Under *Pastime* and *Tayloe*, the liability limitation in the ATS bill of lading properly applies to all damages, including any claims for special or consequential damages.  Custom Rubber's costs to repair the machine totaled $180,412.21, which clearly is more than the maximum $137,785.00 it may recover under the ATS bill of lading.  Since Custom Rubber may not recover even the full amount of "actual loss" it sustained as a result of the accident, its claims for special or consequential damages are denied as moot.

### F.  Whether Custom Rubber May Recover Attorney's Fees

Custom Rubber claims that it is entitled to attorneys fees "based on law that allows for costs and fees under the Carmack Amendment, as well as [for] equitable reasons." (Doc. 50, at 13-14).  Custom Rubber cites three cases - none from the Sixth Circuit - for the proposition that attorneys fees can be awarded in Carmack Amendment cases.  In the first of these cases, *Grupo Sepromi v. Mega Mix*, 2003 WL 24025759 at *2 (D. Ariz. 2003), significantly, the plaintiff and the defendant *agreed* that the plaintiff was entitled to reasonable attorneys fees and costs.  Thus, whether the

Carmack Amendment allows an award of attorneys fees was not a contested issue in that case, and the court held (with no discussion) that the plaintiff was entitled to attorneys fees and costs.   In the second, *Russo v. AAACON Auto Trans., Inc.*, 1982 WL 5903 at *3 (Ohio App. 8th Dist. 1982), the court stated that "[c]ontrary to [the] defendant's contention, the Carmack Amendment does not always bar an award of punitive damages or attorney's fees . . . . Attorney's fees [] can be awarded under the court's equitable powers 'where appropriate in the interests of justice.'" (citing *Miller v. AAACON Trans., Inc.*, 447 F.Supp. 1201 (S.D. Fla. 1978)).  However, the court held in that case that the plaintiff was not entitled to attorney's fees or punitive damages as a matter of law.  *Id.*  The court stated, "[t]here was no reason to award [the] plaintiffs their attorney's fees when they had refused payment from [the] defendant of the amount they ultimately recovered."  *Id.* at *4.  Accordingly, the court's language regarding its ability to award attorney's fees under the Carmack Amendment is dicta.  In the third case, *Hansa Meyer Trans. GMBH & Co., KG v. Norfolk S. Railway Co.*, 2008 WL 2705220 (D.S.C. 2008), the court awarded costs to the plaintiff, noting that prevailing parties are presumptively entitled to an award of costs pursuant to Fed. R. Civ. P 54(d), and that "[c]osts may be denied only when there would be an element of injustice."  *Hansa* is silent as to the issue of attorney's fees.

ATS cites several cases explicitly holding that the Carmack Amendment does not allow for awards of attorneys fees.  *See e.g.*, *Accura Systems, Inc. v. Watkins Motor Lines, Inc.*, 98 F.3d 874, 875 (5th Cir. 1996) (citing another case for the proposition that "[t]his Circuit has held that attorney's fees authorized by state law are not available in Camack Amendment actions," and vacating the district court's award of attorney's fees); *Royal Air, Inc. v. AAA Cooper Trans., Inc.*, 395 F.Supp.2d 436, 441 (W.D.La. 2005) (holding that plaintiff's claim for attorney's fees under

33

either state or common law was preempted because "Congress intended for the Carmack Amendment to provide *the exclusive cause of action for loss of damages to goods arising from the interstate transportation of those goods by a common carrier*"); *J.R. Simplot Co., Inc. v. H&H Trans., Inc.*, 2007 WL 1238727, a t *2 (D. Idaho 2007) (denying plaintiff's claim for attorney's fees and noting that attorney's can be recovered in actions under the Carmack Amendment in two instances - actions based on Section 14704 and 14708 - neither of which applied to that case).

Custom Rubber argues in its opposition to ATS' *Motion for Judgment on the Pleadings* that all of the cases ATS cites "address the Carmack Amendment's *preemptive effect on state statutes* allowing attorney fees for property damage." (Doc. 37, at 3) (emphasis in original).  According to Custom Rubber, since there is no applicable state statute providing for attorney's fees in this case, there is nothing for the Carmack Amendment to preempt.  Therefore, ATS' preemption arguments are irrelevant and the Court is free to award attorney's fees.  The Court does not find this argument persuasive.  In the absence of an express statutory provision for attorney's fees, ordinarily the general rule that a party "pays its own way" applies. "Ohio adheres to the 'American rule' concerning attorney fees.  That rule states that the parties involved in litigation are generally expected to pay their own attorney fees absent a statute or rule authorizing an award of attorney fees." *Lake Pointe Townhomes Homeowners' Assn. v. Bruce*, – N.E.2d –, 2008 WL 4519029 (Ohio App. 8th Dist. 2008) (citing *State ex rel. Grosser v. Boy*, 46 Ohio St.2d 184, 185, 347 N.E.2d 539 (Ohio 1976)).  Thus, even if Carmack were not completely preemptive (and it very likely is - *see* Doc. 12, at 5 (dismissing Custom Rubber's negligence claim as preempted by the Carmack Amendment)), under the general rule, Custom Rubber most likely would need another statute explicitly authorizing attorney's fees in order to prevail on this issue.  The fact that there is no relevant state statute providing for

34

attorney's fees tends to suggest that attorney's fees *should not* be allowed in this case - not the other way around, as Custom Rubber seems to suggest.

ATS also argues in the reply to its *Motion for Judgment on the Pleadings* that Custom Rubber is not entitled to attorney's fees because the portion of the Carmack Amendment applicable here - Section 14706 - is silent on the issue of attorney's fees, whereas other portions of the Carmack Amendment specifically allow for awards of attorney's fees.  *See* 49 U.S.C. § 14708 (allowing for awards of attorney's fees in cases under the Carmack Amendment involving the shipment of household items).  As ATS states, "[i]f Congress intended to provide for an award of attorney's fees under Section 14706, the language would have been included in the text of the statute."  (Doc. 40, at 3).

Neither the Sixth Circuit nor the Northern District of Ohio has ruled on this issue; thus, this too appears to be an issue of first impression.  Although Custom Rubber cites some law tending to support its position, the Court finds the law supporting ATS' position to be more prolific and persuasive.  The Court also finds persuasive ATS' statutory construction argument - i.e., that attorney's fees are inappropriate in this case because the relevant portion of the Carmack Amendment does not contain a provision for attorney's fees, whereas other sections of Carmack do so provide.  Accordingly, the Court finds that an award of attorney's fees ordinarily should be unavailable under Section 14706 of the Carmack Amendment.

However, even if, as Custom Rubber argues, "[a]ttorney's fees [] can be awarded [in a Carmack Amendment case] under the court's equitable powers 'where appropriate in the interests of justice,'" the Court finds that Custom Rubber has failed to show why an award of attorney's fees is appropriate here.  Under *Alyeska Pipeline Serv. Co. v. Wilderness Society, Inc.*, 421 U.S. 240, 258

35

(1975), there is an exception to the American rule regarding attorney's fees where the losing party has acted in "bad faith, wantonly or for oppressive reasons." Custom Rubber claims that it is entitled to attorney's fees based on this exception because it has been forced unfairly "to defend itself against Defendant's bold-faced misrepresentations to the Court" and "Defendant's dilatory and baseless arguments," and because "[t]his matter should have resolved immediately without the need to file this legal action." (Doc. 55, at 8-9).  Dissatisfied as it may be with ATS' arguments and the course of this litigation, Custom Rubber has failed to demonstrate how ATS has acted in "bad faith, wantonly, or for oppressive reasons" within the meaning of *Alyeska*.  Accordingly, the Court finds that the equities do not justify awarding Custom Rubber attorney's fees in this case.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part Custom Rubber's *Motion for Summary Judgment*; GRANTS in part and DENIES in part ATS' *Motion for Summary Judgment*; and DENIES as moot ATS' *Motion for Judgment on the Pleadings* on Plaintiff's Claim for Attorney's Fees Under the Carmack Amendment.  The Court orders ATS to pay Custom Rubber $137,785.00 pursuant to its liability under the Carmack Amendment and the ATS bill of lading.  Custom Rubber's claims for special or consequential damages and attorney's fees are DENIED.


IT IS SO ORDERED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge


Date: January 7, 2009.

36